IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE R. RAUSCHER, | ) | CASE NO. 1:21-cv-222 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jaqueline R. Rauscher ("Plaintiff" or "Ms. Rauscher") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be AFFIRMED.

## I. Procedural History

On September 19, 2018, Ms. Rauscher filed applications for DIB and POD. (Tr. 86-87, 99-100.) She alleged a disability onset date of December 7, 2017. (*Id.*) She alleged disability due to back problems, cervical spondylosis, fibromyalgia, lupus, type 1 diabetes, chronic fatigue

syndrome, arota [sic] regurgitation/leaking heart valve, sleep apnea, hypothyroidism, bipolar, anxiety, and depression.  (*Id*.)  Ms. Rauscher's applications were denied at the initial level (Tr. 86-98, 99-111) and upon reconsideration (Tr. 114-127, 128-41), and she requested a hearing (Tr. 177-78).  On April 21, 2020, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 35-58.)

On June 5, 2020, the ALJ issued a decision finding Ms. Rauscher had not been under a disability within the meaning of the Social Security Act from December 7, 2017 through the date of the decision.  (Tr. 7-22.)  On November 27, 2020, the Appeals Council denied Ms. Rauscher's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On January 28, 2021, Ms. Rauscher filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 12, 14.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Rauscher was born in 1973 and was 44 years old on the alleged disability onset date, making her a younger individual under Social Security Regulations during the relevant period. (Tr. 20.)  She had at least a high school education and was able to communicate in English.  (*Id*.) Ms. Rauscher had not worked since December 7, 2017, the alleged onset date.  (Tr. 13.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

Although the ALJ identified numerous severe mental and physical impairments (Tr. 13), Ms. Rauscher has challenged the ALJ's characterization of evidence relating to her mental health

impairments (ECF Doc. 12 p. 20-21), upper extremity impairments (*id.* at pp. 21-22), and asthma (*id.* at p. 22).  The evidence summarized herein is accordingly focused on those impairments.

### i.     Mental Health Impairments

On August 3, 2017, Ms. Rauscher sought treatment from psychiatrist Theophilus Arthur-Mensah, M.D. for multiple somatic complaints, including bouts of decreased concentration and exhaustion.  (Tr. 918.)  On examination, Ms. Rauscher displayed depressed and anxious mood and thoughts of hopelessness.  (*Id.*)  Dr. Arthur-Mensah noted her current medications were Trileptal, Abilify, Klonopin, and Nuedexta, and indicated she should continue her medications but start Latuda, discontinue Abilify, and hold Nuedexta.  (Tr. 919.)

Ms. Rauscher returned to Dr. Arthur-Mensah on August 25, 2017, complaining of increased irritability, difficulty sleeping, and crying spells.  (Tr. 921.)  On examination, she displayed depressed, irritable, angry, and anxious mood, and irritable and anxious affect.  (*Id.*) Dr. Arthur-Mensah continued prescriptions for Trileptal and Klonopin, discontinued Latuda, and prescribed Vraylar and Hydroxizine.  (Tr. 922, 932.)

Ms. Rauscher returned to Dr. Arthur-Mensah on November 14, 2017 to follow up for "mixed mania."  (Tr. 899.)  She reported "cry[ing] all the time" and a short temper.  (*Id.*)  Her husband reported she was overreacting to things.  (*Id.*)  On examination, she displayed irritable mood, labile affect, racing thoughts, impaired short-term memory, and poor concentration.  (*Id.*) Dr. Arthur-Mensah diagnosed mixed bipolar disorder and unspecified anxiety disorder.  (Tr. 900.)  He increased her doses of Trileptal, Vistaril, and Vraylar, and recommended she follow up in one month.  (*Id.*)

On December 12, 2017, Ms. Rauscher returned to Dr. Arthur-Mensah with complaints of facial tics, difficulty controlling her temper, crying spells, decreased sleep, and increased alcohol

intake which she attributed to Vraylar. (Tr. 902.)  Dr. Arthur-Mensah continued her Trileptal, Vistaril, and Klonopin, decreased her dosage of Vraylar with the intent of tapering off that medication, and recommended she return in six weeks.  (Tr. 903.)

On January 7, 2018, Ms. Rausher returned to Dr. Arthur-Mensah and reported "uncontrollable sobbing" and suicidal ideation.  (Tr. 909.)  She stated she wanted to check herself into inpatient care.  (*Id.*)  On examination, she displayed depressed mood, "sobbing" affect, poor concentration, and distractibility.  (*Id*.)  Dr. Arthur-Mensah advised her to call the crisis number or go to the ER if she felt unsafe, continued Vistaril, Trileptal, and Klonopin, initiated treatment with Paxil, and recommended she return in four weeks.  (Tr. 909-10.)

Ms. Rauscher returned to Dr. Arthur-Mensah on February 20, 2018.  (Tr. 880.)  She reported no suicidal ideation, better sleep, and decreased crying episodes since beginning Paxil, but stated she "doesn't want to go outside."  (*Id*.)  On examination, she displayed improved mood, calm affect, racing thoughts, and ruminations.  (*Id*.)  Dr. Arthur-Mensah continued her on Klonopin, Vistaril, Trileptal, and Paxil, and advised her to follow up in one month.  (Tr. 881.)

On May 14, 2018, Ms. Rauscher returned to Dr. Arthur-Mensah and reported improved depression and anxiety but difficulty with anger.  (Tr. 912.)  On examination, she denied racing thoughts and described her mood as "not bad," but displayed some constricted affect, poor attention, and distractibility.  (*Id*.)  Dr. Arthur-Mensah continued her on Klonopin, Vistral, Trileptal, and Paxil, and advised her to follow up in two months.  (Tr. 913.)

Ms. Rauscher returned to Dr. Arthur-Mensah on July 17, 2018, reporting increased irritability, anger, and forgetfulness.  (Tr. 882.)  On examination, she displayed irritable, angry and anxious mood, euthymic affect, and fair insight and judgment.  (*Id*.)  Dr. Arthur-Mensah

4

continued her on Klonopin, Vistaril, and Trileptal, decreased her dosage of Paxil, and advised her to return in four to six weeks. (Tr. 883.)

Ms. Rauscher contacted Dr. Arthur-Mensah's office on July 25, 2018, stating she experienced increased irritability and extreme outbursts after decreasing her dosage of Paxil. (Tr. 888.) Dr. Arthur-Mensah recommended an increased dose of Klonopin and discontinuance of Paxil, and scheduled her for an appointment the following Monday. (*Id*.) At that July 30, 2018 appointment, Ms. Rauscher reported that she experienced "physical outbursts," including throwing things and destroying objects, after tapering off Paxil. (Tr. 891.) She continued to experience mood swings, from irritability to anger to crying, and was drinking at least twice a week. (*Id*.) On examination, she displayed irritable, angry, and anxious mood, labile affect, racing thoughts, and worry. (*Id*.) Dr. Arthur-Mensah continued her on Trileptal and Vistaril, decreased her dosage of Klonopin, amended her diagnoses to alcohol use disorder and bipolar disorder, and referred her for counseling. (Tr. 892.)

On August 2, 2018 Ms. Raucher had an initial counseling session with Nadine M. Bardar, M.Ed., LPCC-S, with the goals of stabilizing her mood, decreasing her anxiety, and increasing medication compliance. (Tr. 996.) She reported increased crying spells and anger outbursts. (Tr. 997.) On examination, she displayed depressed/sad/angry mood and affect, and cooperative, pleasant, engaging, and agreeable behavior. (*Id*.) The following week, Ms. Rauscher reported side effects from her new medications, including increased crying spells and anger, and said she was functioning at a "forty percent" level. (Tr. 895, 997.) Her mental status examination findings remained generally unchanged. (*Id*.) Ms. Bardar referred her to psychiatry for treatment of medication side effects. (*Id*.)

On August 10, 2018, Ms. Rauscher returned to Dr. Arthur-Mensah and reported feeling depressed and angry all the time, and experiencing leg swelling unrelated to her other medical conditions.  (Tr. 897.)  On examination, she displayed depressed mood with irritability and anger, and a depressed affect.  (*Id*.)  Dr. Arthur-Mensah continued her on Klonopin and Vistaril, discontinued her Trileptal dosage due to concerns about leg swelling, and added Lithium and Abilify.  (Tr. 897-98.)  At a follow up appointment two weeks later, she reported eating better and experiencing no more medication side effects.  (Tr. 875.)  On examination, she displayed a less irritable mood and euthymic affect.  (*Id*.)  Her medications were continued.  (Tr. 876.)

Ms. Rauscher made a late cancellation of a therapy appointment on August 15, 2018 (Tr. 877), and next saw Ms. Bardar on August 28, 2018 (Tr. 865).  On examination, she displayed congruent mood and affect, cooperative, pleasant, engaging, and agreeable behavior, and increased motivation and energy.  (*Id*.)

On September 20, 2018, Ms. Rauscher returned to Dr. Arthur-Mensah and reported "hardly sleeping and having problems with joints."  (Tr. 867.)  Dr. Arthur-Mensah noted she displayed less irritability and crying spells and a euthymic affect.  (*Id*.)  He continued Abilify and Klonopin, and increased her dose of Lithium.  (Tr. 868.)

On October 3, 2018, Ms. Rauscher did not attend a scheduled therapy appointment with Ms. Bardar.  (Tr. 864.)  Later that month, on October 22, 2018, Ms. Rauscher told Dr. Arthur-Mensah she was feeling "like crap," agitated and nervous, and experiencing angry episodes, shortness of breath and chest pain.  (Tr. 857.)  On examination, she displayed depressed, irritable, angry, and anxious mood and labile affect.  (*Id*.)  Dr. Arthur-Mensah continued her on Lithium and Abilify, and increased the dosage of Klonopin.  (Tr. 858.)

An unsigned treatment note from November 1, 2018 stated Ms. Rauscher was experiencing medication side effects, including tremulousness and loss of balance.  (Tr. 854.)  On examination, Ms. Rauscher displayed depressed and anxious mood with a blunted affect.  (*Id*.)  Treatment notes indicate a diagnosis of bipolar with lithium toxicity.  (Tr. 855.)  Lithium was discontinued and treatment with Trileptal was initiated.  (*Id*.)  Ms. Rauscher cancelled her therapy appointment with Ms. Bardar on November 7, 2018.  (Tr. 840.)

On November 16, 2018 Ms. Rauscher saw Dr. Arthur-Mensah and reported she was using a CPAP and her sleep schedule was a mess, she was experiencing nightmares, disrupted sleep, anxiety, sadness, grief, feelings of hopelessness or helplessness, and overstimulation, and was avoiding going outside.  (Tr. 836-37.)  On examination, she displayed depressed and anxious mood, euthymic affect, and hopeless thought content.  (*Id*.)  Dr. Arthur-Mensah continued her on Lamictal, Abilify, and Trileptal, and increased her dose of Klonopin.  (Tr. 838.)

At a follow-up on with Dr. Arthur-Mensah on January 17, 2019, Ms. Rauscher reported weight gain, feeling sad, loss of interest, and brain fog, and said she had "retreated to home." (Tr. 842.)  On examination, she displayed depressed mood and had gained 16-pounds since her visit two months prior.  (*Id*.)  Dr. Arthur-Mensah noted she was dealing with financial pressures and was responsible for the care of her mother, who had dementia, and her son, who had autism.  (Tr. 843.)  He continued Abilify and prescribed Seroquel, Zoloft, and Topamax.  (Tr. 842-843.)

Treatment notes from March 7, 2019 and April 16, 2019 appear to be intermingled.  (Tr. 848-50.)  On March 17, 2019, Dr. Arthur-Mensah increased Ms. Rauscher's dosage of Seroquel and continued her on Topamax and Klonopin.  (Tr. 849.)  In an undated note, he indicated Ms. Rauscher had become more aggressive and paranoid on the increased dosage of Seroquel, including being violent towards her husband and accusing him of having an affair, but that her

7

symptoms had improved after he discontinued Seroquel a week prior.  (Tr. 848.)  On April 16, 2019, Dr. Arthur-Mensah prescribed Topamax, Klonopin, and Trileptal.  (Tr. 850.)

During her visit to Dr. Arthur-Mensah on May 13, 2019, Ms. Rauscher reported her physical symptoms were getting worse, which was causing mental difficulties including depression and an increased need for sleep.  (Tr. 844.)  She had seen a church counselor twice.  (*Id*.)  Dr. Arthur-Mensah noted she was dealing with multiple health issues, including diabetes, cervical pain, lupus, and hypertension management issues.  (Tr. 845.)  On examination, she displayed depressed, irritable, and angry mood with labile affect.  (*Id*.)  Her medications were unchanged, and he recommended she return in six weeks.  (Tr. 846.)

On May 21, 2019 Ms. Rauscher had an intake appointment with Miranda O'Dell, LPC, MFT at Allied Behavioral Health Services ("Allied").  (Tr. 1522.)  She reported that she had been seeing a psychiatrist for bipolar disorder but had been "on and off meds."  (*Id.*)  She also reported she had previously engaged in therapy, but not with any consistency, and sought coping skills for relationship issues with her grandmother.  (*Id*.)  She had been sober approximately one month.  (Tr. 1523.)  On examination, Ms. Rauscher displayed clear speech, logical thoughts, depressed mood, constricted affect, and cooperative attitude and behavior.  (Tr. 1530.)

On May 30, 2019, she reported to Ms. O'Dell that she felt depression was impacting her, but not to the point that she needed to go to the hospital.  (Tr. 1538.)  On June 18, 2019, she told Ms. O'Dell that she "relapsed after her last session."  (Tr. 1539.)  The intake assessment was completed at this appointment, and she was diagnosed with alcohol use disorder, bipolar I disorder, and post-traumatic stress disorder ("PTSD").  (Tr. 1539, 1535.)  Ms. Rauscher returned for counseling on June 27, 2019, and reported improvement in her mood and cessation of alcohol use.  (Tr. 1542-43.)

On July 3, 2019 Ms. Rauscher returned for medication management with Dr. Arthur-Mensah, reporting things were going pretty well and therapy was "effective in helping her" with regard to malignant childhood experiences and alcohol abuse.  (Tr. 2388.)  On examination, she displayed cooperative manner, depressed and anxious mood with labile affect, and intact insight and judgment.  (*Id*.)  Dr. Arthur-Mensah added a diagnosis of PTSD and continued her medications.  (Tr. 2389.)  On July 23, 2019 (Tr. 1544) and August 13, 2019 (Tr. 1546) Ms. Rauscher had additional therapy sessions with Ms. O'Dell.  Ms. O'Dell noted her level of functioning was "unchanged" with "some progress."  (Tr. 1545, 1547.)

At her follow up with Dr. Arthur-Mensah on September 11, 2019, Ms. Rauscher reported she had been in the hospital multiple times due to dizzy spells, atrial fibrillation, right-sided weakness, and hypotension, and felt overwhelmed.  (Tr. 2385.)  Dr. Arthur-Mensah noted that the related diagnosis of syndrome of inappropriate antidiuretic hormone secretion ("SIADH") was attributed to Trileptal.  (*Id*.)  On examination, she displayed irritable mood and euthymic affect.  (*Id*.)  Dr. Arthur-Mensah discontinued Topamax and Oxcarbazepine.  (Tr. 2386).

On January 9, 2020 Ms. Rauscher saw care provider Isaac Bofah Jr.,[1] and reported she had taken herself off all her psychiatric medications due to health concerns.  (Tr. 2373.)  She reported experiencing six panic attacks since her prior visit, characterized by chest pressure, racing heart, shakiness, and shortness of breath.  (Tr. 2374.)  On examination, she displayed depressed, anxious, and irritable mood, constricted affect, and fair insight and judgment.  (Tr. 2377.)  Ms. Rauscher's dosage of Klonopin was reduced and notes indicate Mr. Bofah was waiting on the medical team to complete tests before ordering further treatment.  (Tr. 2382.)  He advised her to return in one month.  (*Id*.)

---

[1] Mr. Bofah's professional credentials are not specified in the record.  A space for "MD signature" on the records is blank.  (Tr. 2349, 2359, 2371, 2383.)

Ms. Rauscher returned to Mr. Bofah on January 14, 2020, reporting ongoing anxiety with moderate to severe mood swings and severe irritability.  (Tr. 2361.)  She reported three panic attacks since her last visit, associated with racing heart, shortness of breath, dizziness, confusion, and chest pressure.  (Tr. 2362.)  She also reported repetitive nightmares and symptoms of agoraphobia, including discomfort among crowds and the inability to go to the grocery store unless she went really early to avoid crowds.  (*Id*.)  Mr. Bofah initiated treatment with Abilify, increased her dosage of Klonopin, and advised her to return in one week.  (Tr. 2370.)

At her next visit with Mr. Bofah on January 23, 2020, Ms. Rauscher reported she was "doing better," but needed further treatment for anxiety, irritability, over stimulation, and sleep problems.  (Tr. 2350.)  She reported "mild" panic attacks, but "nothing full blown."  (Tr. 2351.)  On examination, she displayed depressed, anxious, and irritable mood, labile affect, and fair judgment and insight (Tr. 2354-55.)  Her dosage of Abilify was increased and she was advised to return in two weeks.  (Tr. 2358-59.)

Ms. Rauscher returned on February 4, 2020, reporting her mood had improved since Abilify was increased but that she continued to experience depression, anger, sleep problems, anxiety, moderate mood swings, and agoraphobia.  (Tr. 2339-41.)  On examination, she displayed depressed, anxious and irritable mood with labile affect, poor insight and fair judgment.  (Tr. 2344-45.)  Her dosage of Abilify was again increased, she was advised to return in two weeks.  (Tr. 2348-49.)  Mr. Bofah noted that a clinical interview was completed, and that Ms. Rauscher met the criteria for agoraphobia.  (Tr. 2348-49.)

Ms. Rauscher returned on February 13, 2020, reporting she was having difficulty coming downstairs due to her agoraphobia.  (Tr. 2327.)  Mr. Bofah discontinued Abilify due to a decrease in white blood cell count, increased her Klonopin, and noted he was waiting for her

next sodium level draw before initiating treatment with an SSRI.  (Tr. 2328.)  He advised her to return in one month.  (Tr. 2337.)

On March 11, 2020, Ms. Rauscher reported to Dr. Arthur-Mensah that she was not doing well, and was experiencing "high anxiety" with difficulty leaving in her home.  (Tr. 2324.)  He noted that Abilify and Effexor had been discontinued.  (*Id*.)  On examination, she displayed depressed and anxious mood and affect, thoughts of hopelessness and worthlessness, and ruminations.  (*Id*.)  Dr. Arthur-Mensah prescribed Zoloft and Rexulti, continued Klonopin, and advised her to follow up in four weeks.  (Tr. 2324.)

Ms. Rauscher returned to Dr. Arthur-Mensah on April 9, 2020 and reported "doing ok" on her current medicine, although she remained isolated, felt easily overwhelmed, and avoided going out in public.  (Tr. 2321.)  On examination, she displayed anxious mood and ruminations. (*Id*.)  Dr. Arthur-Mensah increased her dosage of Zoloft, continued Rexulti and Klonopin, and offered diagnoses of PTSD, panic disorder with agoraphobia, and borderline personality disorder (Tr. 2322.)

### ii.     Physical Impairments

On July 21, 2017, Ms. Rauscher attended an office visit with primary care provider Evan Rae, D.O. for a recheck regarding obesity, and seeking new referrals for specialized treatment. (Tr. 330.)  She had been treating at the Cleveland Clinic, but indicated they no longer took her insurance.  (*Id.*)  Her physical examination findings were within normal limits, with the exception of right knee tenderness.  (Tr. 330-31.)  Dr. Rae provided referrals for pain management, endocrinology, rheumatology, and orthopedics.  (Tr. 331.)

On November 13, 2017, Ms. Rauscher saw rheumatologist Margaret Tsai, M.D. for treatment of lupus and positive ANA.  (Tr. 397.)  Dr. Tsai noted Ms. Rauscher ambulated with a

cane and was receiving physical therapy following a total knee replacement the prior month.
(*Id*.)  She was noted to be "[o]ff methotrexate/arava," with "chronic nausea, not as bad" and a
skin rash that was "ok, present but tolerable."  (*Id*.)  She reported "overall doing ok," but said she
experienced mild discomfort that included joint pain in her hands, wrists, and knees, swelling in
her hands, low back pain, dactylitis, and carpal tunnel syndrome.  (Tr. 397, 400.)  On
examination, Ms. Rauscher exhibited an abnormal gait favoring the right lower extremity, use of
a cane, limited range of motion due to pain in her right knee, tenderness to palpitation in her hips
bilaterally, and her right foot was mildly tender to palpitation.  (Tr. 402.)  She had 11/18 tender
points.  (*Id*.)  Her hands and wrists were mildly tender to palpitation with fair range of motion,
and she had diffuse tenderness to palpitation in her shoulders bilaterally.  (*Id*.)  Her diagnoses
included systemic lupus erythematosus ("SLE") with other organ involvement, discoid lupus
erythematosus, fibromyalgia, ANA positive, and bilateral carpal tunnel syndrome ("CTS").  (*Id.*)
Dr. Tsai prescribed Nebivolol and Plaquenil.  (Tr. 403.)

On March 19, 2018, Ms. Rauscher attended an office visit with primary care provider Dr.
Rae, complaining of a sudden and worsening cough for the prior three months.  (Tr. 562.)  On
examination, her respiration was unlabored, her pulse oximetry was 98% on room air, and her
lungs were clear to auscultation with normal breathing effort.  (Tr. 562-63.)  Dr. Rae noted there
was no improvement in her cough after stopping lisinopril one month before, and suspected the
cough was related to gastro-intestinal reflux disease ("GERD").  (Tr. 563.)  He made medication
changes and noted she was scheduled for an EGD in a few weeks.  (*Id.*)

Ms. Rauscher was treated for trigger finger at the orthopedic department at Cleveland
Clinic on April 10, 2018.  (Tr. 667.)  Daniel J Brezinski, PA noted a history of trigger finger in
her right middle finger, for which she had received an injection in June 2017.  (*Id*.)  Ms.

Rauscher reported that her symptoms recently returned, and she began to experience triggering symptoms of her left middle finger.  (*Id*.)  On examination, PA Brezinski noted she had full extension of all fingers with no swelling or ecchymosis, and triggering of the right index and ring fingers and left middle finger, with flexion as well as tenderness to palpitation at the palmer aspect of the distal third and fourth metacarpal's consistent with the A1 pulley of the bilateral hands.  (*Id*.)  He administered cortisone injections to both hands.  (Tr. 668.)

On May 15, 2018 Ms. Rauscher attended an initial visit with allergy/immunology doctor Nancy Wasserbauer, D.O. regarding asthma and breathing issues.  (Tr. 556.)  On examination, her respiration was unlabored, her pulse oximetry was 98% with room air, and she gave normal breathing effort.  (Tr. 557-58.)  Dr. Wasserbauer observed an expiratory wheeze, but noted increased aeration and decreased wheeze after she used an albuterol nebulizer.  (Tr. 558.)  Ms. Rauscher was diagnosed with asthma of unspecified severity and noted to have been a smoker for thirty years.  (*Id*.)  Dr. Wasserbauer ordered testing, and prescribed albuterol solution with a nebulizer, plus a few days of low dose prednisone.  (Tr. 558.)

She returned to see Dr. Wasserbauer on June 19, 2018, complaining of continued allergy symptoms and allergic rhinitis.  (Tr. 551.)  On examination, her breathing was unlabored, her pulse oximetry was 96% on room air, and her lungs were clear to auscultation with normal breathing effort and no expiratory wheeze.  (Tr. 552-53.)  Dr. Wasserbauer added Tudorza for asthma and noted that Ms. Rauscher would start immunotherapy in the near future.  (Tr. 553.)

On July 26, 2018, Ms. Rauscher returned to PA Brezinski, reporting her trigger finger symptoms had returned in her right middle finger.  (Tr. 674.)  On examination, PA Brezinski noted right trigger middle finger slightly decreased sensation, and recommended follow-up with a doctor to discuss surgical intervention.  (*Id*.)  On July 30, 2018, Ms. Rauscher met with surgeon

13

Victor Nemeth, M.D. to discuss surgery to correct right middle finger triggering.  (Tr. 681.)  Dr. Namath noted previous carpal tunnel release of the right hand, and Ms. Rauscher's report that she still gets "funny feelings in the fingers."  (*Id*.)  On examination, Dr. Namath noted tenderness to the right A1 pulley and PIP contracture, and recommended surgical release.  (*Id*.)

Ms. Rauscher went to the Emergency Department ("ED") at University Hospitals Avon Medical Center on August 1, 2018, complaining of shortness of breath.  (Tr. 495.)  She described moderate difficulty breathing, worsening over the prior two days, with a nonproductive cough, wheezing, chest pain, exertional shortness of breath, and inability to sleep flat.  (*Id*.)  She appeared to be in moderate respiratory distress.  (*Id*.)  Bilateral wheezing was noted on examination.  (Tr. 499.)  Ms. Rauscher received respiratory aerosol treatment in the ED, which eased her breathing.  (Tr. 498.)  She was discharged with a prescription for albuterol solution for inhalation and directed to use a nebulizer every four hours as needed for wheezing.  (Tr. 501.)  She was also prescribed a tapering dose of prednisone and albuterol inhaler.  (*Id*.)

On August 3, 2018, Ms. Rauscher saw primary care provider Dr. Rae for treatment of lower extremity edema extending to the knees, which reportedly had been unchanged for two months.  (Tr. 544.)  Ms. Rauscher reported relief with elevation of her legs.  (Id.)  Dr. Rae noted her recent ED visit and observed "[s]ymptoms improved today."  (*Id*.)  On examination, Ms. Rauscher's lungs were clear to auscultation, her breathing effort was normal, she had 1+ pitting edema of the bilateral lower extremities with varicose veins, and her mood and affect were normal.  (Tr. 545.)  Dr. Rae recommended leg elevation and compression stockings, and referred Ms. Rauscher to a vascular specialist for further management.  (Tr. 547.)

On August 23, 2018, Ms. Rauscher underwent trigger finger release surgery on her right middle finger.  (Tr. 736.)  On September 4, 2018, she returned to Dr. Nemeth for follow-up.  (Tr.

687.)  He noted the incision had healed and there was no longer any triggering.  (*Id*.)  Dr. Nemeth also noted "she had been really pretty active," and advised her "to take it easy with that and not to overdo it."  (*Id*.)

Ms. Rauscher returned to Dr. Rae on September 5, 2018, complaining of dizziness, lightheadedness, and loss of balance daily when standing, beginning one month prior.  (Tr. 539.)  On examination, Ms. Rauscher's lungs were clear to auscultation, her breathing effort was normal, she had trace edema of the leg, normal and symmetrical muscle tone and strength, and normal mood and affect.  (Tr. 540.)  Dr. Rae noted a CT scan done the prior day was negative for acute findings, and that orthostatics were negative.  (Tr. 543.)  He recommended follow-up with a neurologist.  (*Id.*)

Ms. Rauscher also had an urgent visit with rheumatology on the same day, complaining of dizziness progressively worsening for two months and reporting she had been advised to follow up with all of her doctors.  (Tr. 693.)  She was seen by Susan P. Mathai, M.D.  (*Id.*)  She reported chronic aches and pains, but denied any red hot swollen joints.  (*Id.*)  She reported that her last flare of SLE was about a year prior, and that she had no recent flares.  (Tr. 693, 697.)  She denied any symptoms of active SLE but did report morning stiffness for "about half hour."  (*Id.*)  On examination, she demonstrated a normal gait and station and all joints were observed to be normal without pain, tenderness, swelling, deformity, sublaxation, and with a full range of motion.  (Tr. 697.)  Dr. Mathai found the etiology for her reported dizziness to be unclear, and recommended that she contact endocrinology regarding insulin adjustment.  (Tr. 698.)

On September 27, 2018, Ms. Rauscher presented to Dr. Rae with an upper respiratory infection.  (Tr. 536.)  He examination revealed inspiratory and expiratory wheeze and fine rales,

but unlabored breathing, no retractions, and no conversational dyspnea.  (Tr. 537.)  Dr. Rae

diagnosed bronchitis and prescribed Medrol and amoxicillin.  (*Id.*)

At a follow-up with Dr. Rae on October 4, 2018, Ms. Rauscher reported "mild and

improving" bouts of intermittent dizziness lasting for seconds at a time, exacerbated by standing

and relieved by rest.  (Tr. 533.)  Dr. Rae noted Ms. Rauscher had a neurology appointment

scheduled for the end of the month.  (*Id*.)  Examination results were unchanged from September

5, 2018.  (Tr. 534.)  Dr. Rae also made a referral to cardiology due to an echocardiogram which

showed moderate aortic regurgitation.  (*Id*.)

Ms. Rauscher attended a cardiac evaluation with Sean Lyons, M.D. on October 24, 2018,

with complaints of a recent syncopal episode and dizzy spells, chest pains, and findings of

moderate aortic insufficiency on a recent echocardiogram.  (Tr. 627.)  She reported smoking half

a pack of cigarettes per day.  (Tr. 629.)  On examination, her lungs were clear bilaterally with

good chest wall excursion, and no rales, rhonchi, or wheezing.  (Tr. 630-31.)  Dr. Lyons ordered

a stress test for atypical angina and a telemetry monitor for dizziness, noted that Ms. Rauscher's

moderate aortic insufficiency did not appear to be clinically a problem, indicated her reported

dyspnea was likely related to her sleep apnea and asthma, but ordered a Lexiscan calcium score

to rule out any cardiac component.  (Tr. 631.)

On November 16, 2018, Ms. Rauscher attended a pain management follow up visit with

Barbara Maline, PA-C, reporting "slightly worse" low back and neck pain.  (Tr. 705.)  On

examination, her respirations were even and non-labored, but she demonstrated a right lower

expiratory wheeze.  (Tr. 706.)  She also demonstrated diffuse muscle tenderness, as well as

tenderness to the bilateral trapezius muscles and cervical paraspinal muscle, and tenderness to

palpation to the lumbar spine and right sacroiliac joint.  (*Id.*)  Her gait was normal, her sensation

was intact, and her motor strength and tone were 5/5 throughout.  (*Id.*)  PA Maline ordered a TENS unit for her fibromyalgia and provided a consult to physical therapy for back and neck pain.  (Tr. 708.)

On March 28, 2019, Ms. Rauscher followed up with orthopedic surgeon Dr. Nemeth and reported her right middle finger had begun locking up again in January.  (Tr. 728.)  On physical examination, Dr. Nemeth noted flexion contracture of the PIP joint on the right middle finger and occasional catching.  (*Id*.)  He stated that "he had never seen this before," and surmised that scar tissue was causing the catching and ongoing symptoms.  (*Id*.)  Dr. Nemeth recommended stretching exercises and administered a cortisone injection.  (*Id*.)

Ms. Rauscher attended an office visit with rheumatologist Dr. Tsai on June 17, 2019. (Tr. 1380.)  Dr. Tsai noted that Ms. Rauscher was status-post fusion surgery of her SI joint, which had been performed four months prior.  (*Id*.)  Ms. Rauscher reported she was having more lower back pain with radiation to the right lower extremity since the surgery, but that her spine surgeon had left the practice.  (*Id.*)  She also reported having to do more errands and drive due to her husband's recent neck surgery.  (*Id*.)  She endorsed rheumatologic symptoms that included joint pain in the hands, wrists, and knees, swelling, morning stiffness, fatigue, and difficulty sleeping.  (Tr. 1383.)  On examination, Ms. Rauscher displayed abnormal gait and ambulation with a cane, wheezes that cleared with coughing, mild tenderness in the hands and wrists, positive Tinel's test on the left, and diffuse tenderness of the shoulders bilaterally. (Tr. 1385.) She had full muscle strength and reflexes bilaterally.  (*Id*.)  Her diagnoses included secondary osteoarthritis of multiple sites, SLE with other organ involvement, cervicalgia, fibromyalgia, and ANA positive.  (*Id*.)  Dr. Tsai ordered a lumbar X-ray and referred Ms. Rauscher to a spine surgeon.  (*Id*.)

17

On October 22, 2019 Ms. Rauscher returned to Dr. Tsai, reporting a diagnosis of SIADH for low sodium that had been better since starting sodium tabs.  (Tr. 2206.)  She reported that she continued to take daily Plaquenil, continued to report minimal morning stiffness, mild discomfort, and feeling very tired, and had quit smoking.  (*Id.*)  On examination, Ms. Rauscher was "very pleasant," displayed abnormal gait and ambulation with the cane, full range of motion with tenderness in her shoulders and both hands, fair range of motion with positive Tinel's test on the left wrist, limited range of motion with tenderness in the knees and right foot and fair range of motion in the hips.  (Tr. 2212.)  Her diagnoses remained largely unchanged.  (Tr. 2212-13.)  She was continued on Plaquenil, with additional recommendations to use over the counter arthritis cream, acetaminophen, calcium, and vitamin D.  (Tr. 2214.)

### 2.      Opinion Evidence - State Agency Reviewers

On February 26, 2019, state agency reviewing physician David Knierim, M.D. reviewed the medical evidence and adopted the RFC finding from the prior ALJ decision dated December 5, 2017, finding the record did not reveal any new and material evidence that would support changing the assessed physical restrictions.  (Tr. 95.)  The prior ALJ had determined that Ms. Rauscher was limited to a reduced range of sedentary work.  (Tr. 68.)  These findings were affirmed by Indira Jasti, M.D., on reconsideration.  (Tr. 124.)

On February 16, 2019, state agency reviewing psychologist Karla Delcour, Ph.D. reviewed the records and concluded Ms. Rauscher did not meet the criteria for listings 12.02 (neurocognitive disorders), 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders).  (Tr. 92.)  In assessing the "paragraph B" criteria of those listings, Dr. Delcour assessed no limitation in understanding, remembering, or applying information, and moderate

limitations in interacting with others, concentration, persistence and pace, and adapting or managing oneself.  (Tr. 92-93.)

Dr. Delcour adopted the mental RFC findings contained in the December 5, 2017 prior ALJ decision, and noted that there had been no new impairment alleged, and the medical evidence showed that Ms. Rauscher had no more than moderate limitations in interacting with others and adjusting to changes in the workplace.  (Tr. 92-93, 95.)  The prior ALJ had limited Ms. Rauscher to superficial interactions with the general public, coworkers, and supervisors (with superficial defined as no negotiation, directing the work of others, or conflict resolution), and routine changes in a work environment with no strict time or production demands.  (Tr. 68.)  These findings were affirmed by Aracelis Rivera, Psy.D., on reconsideration.  (Tr. 121-22, 124.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At her April 21, 2020 hearing, Ms. Rauscher testified that she lived with her husband, 12-year-old child and 87-year-old grandmother.  (Tr. 41.)  Her husband was on disability due to mental health issues.  (*Id*.)

With regard to her upper body impairments, she reported that her lupus caused morning stiffness and pain in her hands, elbows, and right shoulder.  (Tr. 50.)  She could not spread her fingers out flat, so she had trouble opening larger jars.  (*Id*.)

With regard to her mental health impairments, she reported they had worsened since the prior ALJ decision.  (Tr. 47.)  Since Christmas, she testified that she rarely went downstairs in her home because she felt overstimulated, withdrawn, and anxious.  (*Id*.)  Instead, she stayed in her bedroom and only left the house for doctor's appointments.  (*Id*.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 51-57.)  The VE testified that the hypothetical individual of with the functional limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including address clerk, surveillance system monitor, and food beverage order clerk.  (Tr. 52-53.)

In response to questioning from Ms. Rauscher's attorney, the VE testified that no sedentary unskilled jobs would be available if the hypothetical individual were additionally limited to never kneeling or crawling, occasional stooping and crouching, never reaching overhead, occasionally reaching in all other directions, occasionally pushing or pulling with the bilateral upper extremities, occasionally handling, never using foot controls, no exposure to pulmonary irritants, hazards, or uneven terrain, and never walking on uneven terrain. (Tr. 56.) The VE testified that the limitations to occasional reaching in all directions and occasional handling would preclude sedentary unskilled work.  (Tr. 56-57.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

20

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

**IV. The ALJ's Decision**

In his June 10, 2020 decision, the ALJ made the following findings:[3]

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.  (Tr. 13.)

2.   The claimant has not engaged in substantial gainful activity since December 7, 2017, the alleged onset date.  (*Id*.)

3.   The claimant has the following severe impairments: obesity, osteoarthritis, cervical and thoracic disc disease, degenerative disc disease in the lumbar spine with fusion surgery in February 2019, fibromyalgia, systemic lupus erythematosus (SLE), bilateral carpal tunnel syndrome, diabetes with neuropathy, hypothyroidism, paroxysmal atrial fibrillation, hypertension, dyslipidemia, coronary artery disease with left anterior descending artery calcification, carotid vascular disease, arrhythmic ptosis, bradycardia, gastroesophageal reflux disease (GERD), asthma, obstructive sleep apnea on CPAP, anxiety disorder, bipolar disorder, alcohol and substance abuse. (*Id*.)

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14.)

5.   The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally lift and carry 10 pounds, frequently lift and carry up to 10 pounds. She can stand or walk about two hours per day and push/pull without limitations. She can occasionally climb ramps and stairs but can never climb ladders ropes or scaffolds. She can frequently handle, finger and feel bilaterally. She must avoid all exposure to hazardous moving machinery and operating hazardous moving machinery such as power saws and jackhammers. She must avoid working in unprotected heights. Furthermore, the claimant is limited to superficial type interactions with the general public, coworkers and supervisors. Superficial type interactions must not involve negotiation, directing the work of others, or conflict resolution but will allow for serving, asking questions, signaling carrying out instructions, and similar duties. She is able to perform routine type work with no strict production quotas *i.e.* assembly line work.  (Tr. 16.)

6.   The claimant has no past relevant work.  (Tr. 20.)

---

[3] The ALJ's findings are summarized.

7.   The claimant was born in 1973 and was 44 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

8.   The claimant has at least a high school education and is able to communicate in English.  (*Id*.)

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work.  (*Id*.)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including address clerk, surveillance system monitor, and food beverage order clerk.  (Tr. 20-21.)

Based on the foregoing, the ALJ determined that Ms. Rauscher had not been under a disability, as defined in the Social Security Act, from December 7, 2017, through the date of the decision on June 10, 2020.  (Tr. 21.)

## V. Plaintiff's Arguments

Ms. Rauscher's sole assignment of error is that the ALJ's findings concerning her RFC were not supported by substantial evidence.  (ECF. Doc. 12 p. 17.)

## VI. Law & Analysis

### A.   Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

23

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654

24

("Generally, … we review decisions of administrative agencies for harmless error.")  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.  Assignment of Error: Whether RFC Was Supported by Substantial Evidence

In her sole assignment of error, Ms. Rauscher asserts that the ALJ's findings regarding her RFC were not supported by substantial evidence because he mischaracterized the record, citing "only evidence that supports his ultimate conclusion, and fail[ing] to acknowledge, or discuss findings that suggest a greater level of severity or a more limited capacity."  (ECF Doc. 12 pp. 17, 19.)  More specifically, she asserts the ALJ failed to accurately characterize evidence of her mental impairments (*id*. at p. 20), failed to properly evaluate and characterize her upper extremity limitations (*id*. at p. 21), and failed to consider significant evidence regarding asthma (*id*. at p. 22).  The Commissioner responds that the ALJ provided a detailed analysis of the evidence and supported his RFC determination with substantial evidence.  (ECF Doc. 14 p. 12.)

The ALJ's findings with respect to each of the three challenged areas will be addressed separately below.  To the extent Ms. Rauscher intended to assert additional errors, they were raised in a perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul*, No. 1:19-CV-01880,

2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

### 1.    Whether Mental RFC Was Supported by Substantial Evidence

The ALJ found the following mental impairments "severe" at Step Two of the sequential analysis: anxiety disorder, bipolar disorder, and alcohol and substance abuse.  (Tr. 13.)  In so finding, he noted he was adopting the findings of the prior 2017 ALJ decision, which had found the same mental impairments to be severe.  (*Id.*; *see* Tr. 65.)  He then found Ms. Rauscher's mental impairments did not meet the mental listings at Step Three, explaining:

> Treatment notes claimant has followed with psychiatrist Theophilus Arthur-Mensah, M.D., at least since 2010. Dr. Arthur-Mensah prescribes psychotropic medication for bipolar disorder, depression and anxiety disorder (Exhibit C-11F, C-12F, C-28F). The claimant struggles with depression and irritability. She is angry all the time due to increased stress and conflict in the home environment and financial pressures. She has an 11-year old son with autism and is responsible for her 86-year old grandmother with dementia, her major stressor (Exhibit C- 11F/13, 58, 61, 67). Initial assessment notes from Allied Behavioral Health Services in May 2019, reflect she had been taking medications intermittently. She has been to therapy but not consistently. She sought therapy to address relationship issues with her grandmother, who had been living with her for five years (C-17F/2).

(Tr. 15.)  He found she had moderate limitations in each of the four functional areas, and acknowledged her complaints of fatigue, sleep problems, difficulty with memory, irritability, anger, withdrawal, isolating, loss of friends due to anxiety, concentration difficulties, lack of energy and motivation to perform daily activities, and taking herself off her medications.  (*Id.*)

Further discussing Ms. Rauscher's mental impairments at Step Four, the ALJ explained:

> Treatment notes reflect the claimant contended with a considerable amount of stress derived from financial burdens, having an 11-year old child with autism and being responsible for her then 86-year old grandmother with dementia. Her husband is on disability (Exhibit C-11F/13, 58, 61, 67, testimony). However, how being responsible for her grandmother and child was not clearly addressed during the hearing. She testified to her husband caring for her child while she was in her room on her electronic devices and to her daughter coming to the home to help. Furthermore, in January 2020, her moods had improved with an Ability [sic] dose increase and she was happy about spending more time with her family. Three

26

months later, she was doing okay with her medications despite avoiding going out
in public other than for attending appointments (Exhibit C-28F/2, 20). Aside from
seeing her psychiatrist for medication reviews, the claimant has not treated with
therapy or counseling and had been taking medications intermittently per her own
admission in May 2019 (Exhibit C-17F/2).

(Tr. 17.)  Based on this analysis, he adopted an RFC with the following mental limitations:

[T]he claimant is limited to superficial type interactions with the general public,
coworkers and supervisors.  Superficial type interactions must not involve
negotiation, directing the work of others, or conflict resolution but will allow for
serving, asking questions, signaling[,] carrying out instructions, and similar duties.
She is able to perform routine type work with no strict production quotas i.e.
assembly line work.

(Tr. 16.)  These limitations are essentially the same as those adopted by a prior ALJ in the 2017

ALJ decision (Tr. 68) as well as those recommended by state agency psychological consultants

Dr. Delcour and Dr. Rivera in this case (Tr. 95, 108, 124, 138).

In arguing that the ALJ's mental RFC findings were not supported by substantial

evidence, Ms. Rauscher contends that "the record substantiates far greater limitations" and "the

ALJ fails to address most of the additional significant findings on Mental Status Examination

('MSE') throughout the pertinent period that could reasonably support a finding of greater

severity of the plaintiff's condition and/or substantiate a more limited functional capacity."

(ECF Doc. 12 p. 20.)  She further argues that the ALJ's "portrayal of Plaintiff's mental health

impairments is wholly inconsistent with the record."  (*Id.*)

To the extent Ms. Rauscher is arguing that the records support greater limitations, it must

again be noted that "'[t]he substantial-evidence standard ... presupposes that there is a zone of

choice within which the decisionmakers can go either way, without interference by the courts.'"

*Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  That means this Court cannot

overturn the ALJ's decision "so long as substantial evidence also supports the conclusion

reached by the ALJ," regardless of whether substantial evidence – or even a preponderance of

27

evidence – supports Ms. Rauscher's more restrictive reading of the evidence.  *Jones*, 336 F.3d at 477; *see also Blakley*, 581 F.3d at 406.

In contrast, to the extent Ms. Rauscher is asserting the ALJ's RFC findings are based on inaccurate findings or a mischaracterization of the evidence, courts have found ALJs erred in such circumstances.  *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

The undersigned will therefore consider whether the record supports Ms. Rauscher's contentions that the ALJ "fail[ed] to accurately characterize evidence of [her] mental health impairments" and "fail[ed] to address most of the additional significant findings on Mental Status Examination ('MSE') throughout the pertinent period."  (ECF Doc. 12 p. 20.)

In support of her argument that the ALJ's discussion of her mental impairments is inconsistent with the records, Ms. Rauscher points out that she "has sought treatment through her treating psychiatrist … since at least August 2017," with the record containing at least thirty monthly treatment visits with Dr. Arthur-Mensah.  (*Id.*)  But a review of the ALJ decision shows he specifically recognized that treatment notes in the record showed Ms. Rauscher had "followed

with psychiatrist Theophilus Arthur-Mensah, M.D., at least since 2010," and that Dr. Arthur-Mensah had prescribed her "psychotropic medication for bipolar disorder, depression and anxiety disorder." (Tr. 15.) In addition to citing generally to the exhibits containing Dr. Arthur-Mensah's treatment notes (Tr. 15), the ALJ's analysis referenced specific psychiatric treatment visits in July 2018 (Tr. 15, 17 (citing Tr. 891), August 2018 (*id.* (citing Tr. 897)), January 2019 (*id.* (citing Tr. 843)), March 2020 (Tr. 15 (citing Tr. 2324)), and April 2020 (Tr. 17 (citing Tr. 2321)), in addition to treatment notes from mental health provider Mr. Bofah in February 2020 (Tr. 15, 17 (citing Tr. 2339-40)) and a mental health assessment completed at Allied Behavioral Health Services in May 2019 (Tr. 15, 17 (citing Tr. 1522)). Ms. Rauscher has not demonstrated that the ALJ misrepresented the timing or extent of her treatment with Dr. Arthur-Mensah.

Ms. Rauscher also argues the ALJ failed to address "significant findings on Mental Status Examination" that could substantiate greater functional limitations. (ECF Doc. 12 p. 20.)[4] She argues further that the ALJ "mischaracterize[d]" her treatment with Dr. Arthur-Mensah as "medication reviews," when Dr. Arthur-Mensah routinely performed mental status examinations with symptomatic findings. (*Id.* at p. 21.) A review of the treatment records demonstrates that Dr. Arthur-Mensah reviewed Ms. Rauscher's psychiatric medications at every visit, in addition to making mental status examination findings and conducting a "therapeutic interview." (*See, e.g.,* Tr. 837-38, 842-43, 854-55, 943-44, 2321-22.) This is consistent with the ALJ's observation that Ms. Rauscher "followed with" Dr. Arthur-Mensah, who prescribed her psychotropic medications (Tr. 15), and "was seeing her psychiatrist for medication reviews" (Tr.

---

[4] Ms. Rauscher provides a more specific argument regarding a 2014 progress note and the ALJ's reported discussion of the same. (ECF Doc. 12 p. 20.) However, neither the quoted portion of the ALJ decision nor the described evidentiary findings are evident from review of the referenced exhibit pages. (*See* Tr. 18, 455-56.) Because this argument was not appropriately developed, it will not be addressed herein. *See McPherson*, 125 F.3d at 995–96.

17).  There is nothing about the ALJ's characterization of Dr. Arthur-Mensah's treatment which suggests he did not conduct mental status examinations, or that such examinations were normal.

Further, while it is true that the ALJ did not document specific mental status examination findings in his decision (symptomatic or normal), it is also evident that he <u>did</u> document – supported by references to specific treatment notes – Ms. Rauscher's complaints of depression, irritability, anger, fatigue, sleep problems, difficulty with memory, withdrawal and isolating, loss of friends due to anxiety, daytime tiredness, concentration difficulties, lack of energy and motivation to perform daily activities, and avoiding going out in public other than for attending appointments,.  (Tr. 15, 17 (citing records).)  In arguing that the ALJ should have provided a discussion of her mental status examination findings, Ms. Rauscher does not point to specific findings that were not discussed, instead referring generally to the types of symptomatic findings that may be found in the records.  (ECF Doc. 12 p. 21.)  A review of the records themselves reveals both symptomatic and normal findings, as set forth in the fact section above.

It is well-established that an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (*per curiam*)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (noting a "failure to discuss … observations does not indicate that they were not considered" and "[a]n ALJ need not discuss every piece of evidence in the record for his decision to stand").  Here, the record reflects that the ALJ considered Ms. Rauscher's symptomatic complaints as set forth in her treatment records.  Ms. Rauscher has not demonstrated that the ALJ's failure to also discuss specific

mental status findings amounted to a mischaracterization of the record or reflected a failure to consider material evidence.

Ms. Rauscher also suggests that the ALJ failed to address treatment records which "demonstrate instability in Plaintiff's conditions and multiple changes in medications and their dosage." (ECF Doc. 12 p. 21.)  This argument, like the last, is made generally and without specific reference to records she believes should have been discussed.  A review of the ALJ decision reveals that he noted Ms. Rauscher was being prescribed "psychotropic medication for bipolar disorder, depression and anxiety disorder," reported she had been taking her medications intermittently in May 2019 (Tr. 15), showed some improvement with a medication change in January 2020, and reported doing okay with her medications three months later (Tr. 17).  A review of the evidence reveals that the ALJ's discussion regarding medications was accurate, although it is also evident that a number of medication changes were not discussed by the ALJ. As noted above, the ALJ need not discuss every finding in the record to demonstrate that he considered the record as a whole.  *Boseley*, 397 F. App'x at 199; *Thacker*, 99 F. App'x at 665. Here, Ms. Rauscher has not met her burden to show that the ALJ's discussion of medications amounted to a mischaracterization of those records or reflected a failure to consider material evidence.

Next, Ms. Rauscher argues that the ALJ mischaracterized the record when he stated "Plaintiff has not treated with therapy or counseling for her mental impairments." (ECF Doc. 12 p. 21.)  Here she is referring to the ALJ's statement at Step Four that "[a]side from seeing her psychiatrist for medication reviews, the claimant has not treated with therapy or counseling..." (Tr. 17.)  Ms. Rauscher is accurate in stating "[w]hile Plaintiff has not consistently undergone therapy, she has engaged in several sessions." (ECF Doc. 12 p. 21.)  Indeed, Ms. Rauscher's

31

characterization of the records is almost identical to the ALJ's own finding at Step Three that "[s]he has been to therapy but not consistently" and "sought therapy to address relationship issues with her grandmother." (Tr. 15.) Records show Ms. Rauscher initiated therapy in August 2018, attended several sessions (Tr. 865, 895, 996-97), cancelled several sessions (Tr. 840, 864, 877), and did not schedule further sessions after November 2018. She then initiated therapy with a new provider in May 2019 (Tr. 1522, 1538), attended several sessions (Tr. 1540-46), and did not schedule further sessions after August 2019. The record is thus consistent with the ALJ's finding at Step Three that she had "been to therapy but not consistently." (Tr. 15.)

While the ALJ's observation at Step Four that Ms. Rauscher "has not treated with therapy or counseling" was factually incorrect, it is evident that this statement was more akin to a typographical error than a mischaracterization of the record. Two reasons support this finding. First, the ALJ specifically (and accurately) found earlier in the decision that Ms. Rauscher had attended therapy "but not consistently." (Tr. 15.) Second, in support of his statement that Ms. Rauscher "has not been treated with therapy or counseling," the ALJ specifically cited to her initial assessment to reinitiate therapy in May 2019 where it was observed that "[s]he has been to therapy but it has not been consistent." (Tr. 17 (citing Tr. 1522).) Because the ALJ otherwise accurately characterized Ms. Rauscher's treatment with therapy, and the ALJ's misstatement regarding therapy appears to be akin to a typographical error, the undersigned finds that the error does not reflect a mischaracterization of the record that would undermine the ALJ's findings or deprive those findings of the support of substantial evidence. *See, e.g., Cameron v. Comm'r of Soc. Sec.,* No. 1:15-cv-169, 2016 WL 11431681, at *7 (E.D. Tenn. Apr. 12, 2016) (finding typographical error harmless and not a basis for reversal where ALJ's decision and assessment of credibility was supported by substantial evidence) (citing *Ulman v. Comm'r of Soc. Sec.,* 693

F.3d 709, 712-13 (6th Cir. 2012)), *report and recommendation adopted sub nom. Cameron v. Colvin*, 2016 WL 4094884 (E.D. Tenn. Aug. 2, 2016).

In the one example where Ms. Rauscher challenges the ALJ's characterization of a specific treatment record, she notes that the ALJ observed her moods had improved with Abilify at one treatment visit, without acknowledging that she was diagnosed with agoraphobia at the same treatment visit. (ECF Doc. 12 p. 21.) The relevant discussion by the ALJ is as follows:

> [I]n January 2020, her moods had improved with an Ability [sic] dose increase and she was happy about spending more time with her family. Three months later, she was doing okay with her medications despite avoiding going out in public other than for attending appointments.

(Tr. 17 (citing Tr. 2321, 2339).) As a technical matter, it is noted that the January 2020 visit was not with Dr. Arthur-Mensah, as suggested by Ms. Rauscher, but rather with Mr. Bofah. (Tr. 2339.) Consistent with the ALJ's discussion, Mr. Bofah did note that Ms. Rauscher "feels she is spending more time with her family which she is happy about" and "feels her moods have improved since the abilify was increased." (*Id.*) This record does also indicate "[c]linical interview done and patient met the criteria for agoraphobia" (Tr. 2340), but the record does not contain information establishing Mr. Bofah to be an acceptable medical source (*see, e.g.,* Tr. 2349 (MD signature blank)). At the second appointment referenced by the ALJ, Dr. Arthur-Mensah observed Ms. Rauscher was "[d]oing ok on current meds," but also diagnosed agoraphobia and observed that she "[r]emains isolated and feels easily overwhelmed" and was "[a]voiding going out in public." (Tr. 2321-22.)

A review of the records again demonstrates that the ALJ accurately characterized those records, but did not summarize every finding therein. Given that the ALJ is not required to recite every finding in the records, the question becomes whether the omission of the identified information resulted in a mischaracterization of the record. Here, while the ALJ did not

33

specifically mention a new diagnosis of agoraphobia, he did observe that "she was doing okay with her medications *despite avoiding going out in public other than for attending appointments.*" (Tr. 17 (emphasis added).) This was consistent with both the specific notations in the records <u>and</u> characteristics associated with the new diagnosis of agoraphobia. Given that the ALJ explicitly recognized the complaints associated with her diagnosis of agoraphobia, Ms. Rauscher has not met her burden to show that the ALJ's failure to mention the diagnosis itself amounted to a mischaracterization of the record or failure to consider material evidence.[5]

As a whole, the record reflects that the ALJ based his assessment of Ms. Rauscher's mental limitations on psychiatric treatment records, therapy records, her hearing testimony, and the opinions of the state agency reviewing psychiatrists, which are the only relevant medical opinions in the record. (Tr. 15, 17, 20.) More specifically, he observed that she: treated with psychotropic medications from the same psychiatrist throughout; admitted taking medications intermittently; sometimes reported improvement with medications; engaged inconsistently in therapy; complained of symptoms that included mood problems, withdrawal, fatigue, and concentration issues; and managed considerable external stressors that included having a child with autism, a grandmother with dementia, and a husband on disability. (Tr. 15, 17.) He adopted an RFC consistent with the findings of the prior ALJ decision and the opinions of the state agency reviewing psychiatrists, which included significant limitations on the need to concentrate, persist, and interact with others. (Tr. 16, 20.) While the ALJ did not explicitly

---

[5] Ms. Rauscher does not argue that the ALJ erred by failing to identify agoraphobia as an impairment. Any such argument is accordingly waived. *See Mitchell v. Comm'r of Soc. Sec.*, No. 1:19-CV-1401, 2020 WL 1316350, at *16 (N.D. Ohio Mar. 12, 2020) ("an issue is waived when the plaintiff fails to specifically raise it in her merits brief."), *report and recommendation adopted* No. 1:19 CV 1401, 2020 WL 1322862 (N.D. Ohio Mar. 20, 2020) (citing *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010)).

identify every piece of objective evidence relating to Ms. Rauscher's mental limitations, he was

not required to do so.  *See Boseley*, 397 F. App'x at 199; *Thacker*, 99 F. App'x at 665.

For all of the reasons set forth above, the undersigned finds that Ms. Rauscher has not

met her burden to show that the ALJ's findings regarding her mental RFC were based on a

mischaracterization of the record or otherwise lacked the support of substantial evidence.

### 2.  Whether Upper Extremity Limitations Were Supported by Substantial Evidence

With respect to Ms. Rauscher's upper extremity limitations, the ALJ identified the

following impairments as severe: fibromyalgia, systemic lupus erythematosus ("SLE"), and

bilateral carpal tunnel syndrome.  (Tr. 13.)  At Step Three, he found the severity of Ms.

Rauscher's SLE did not meet listing 14.02, noting "[t]he record reflects a good response to

medications for SLE despite minimal morning stiffness, and no flares for over one year."  (Tr.

14-15.)  He went on to discuss the relevant impairments at Step Four as follows:

> The record documents diagnosis of fibromyalgia and SLE (C-1A/12). Claimant
> takes Plaquenil for lupus (Exhibit C-3F/36). She follows with Cleveland Clinic for
> management of systemic lupus erythematosus (SLE) with +ANA, and
> fibromyalgia. In November 2017, she had minimal morning stiffness and no
> medication adverse effects (Exhibit C-4F/3). The last lupus flare in March 2017,
> was treated with prednisone with good response. In September 2018, she had no
> symptoms of SLE, which remained under control with no flares for over a year
> (Exhibits C-9F/46, C-13F/23). On follow up in June 2019, she had 11 out of 18
> tender points (Exhibit C-15F/7).
>
> The record documents a history of bilateral carpal tunnel syndrome with carpal
> tunnel release surgery. The claimant treated for trigger finger in several fingers (the
> two middle fingers and the right ring finger) with cortisone injections (Exhibit C-
> 9F/16). She underwent trigger release surgery of right middle finger in July 2018
> that resolved the condition (Exhibit C-9F/36, 85). However, the right middle finger
> started locking again in January 2019. On exam, there was no triggering but the
> finger did not glide smoothly with extension, seeming to catch at times. She treated
> with a cortisone injection (Exhibit C-9F/77). There was no further treatment. <u>The
> residual functional capacity herein provides accommodations for residual tension
> in the fingers as well as for residual symptoms of carpal tunnel syndrome.</u>

(Tr. 18 (emphasis added).)  Based on this analysis, he adopted an RFC with the following upper extremity limitations:

> [T]he claimant has the residual functional capacity to perform sedentary work …
> except she can occasionally lift and carry 10 pounds, frequently lift and carry up to
> 10 pounds. … She can frequently handle, finger and feel bilaterally.

(Tr. 16.)

Ms. Rausher contends that these findings were not supported by substantial evidence because the ALJ "fail[ed] to properly evaluate and characterize [her] upper extremity limitations particularly as they relate to her past medical history of carpal tunnel syndrome, trigger finger and lupus ('SLE')."  (ECF Doc. 12 p. 21.)  In particular, she notes that the ALJ did not address rheumatology records from November 2017, June 2019, and October 2019 which revealed "significant physical examination findings secondary to lupus," such as tenderness in her hands, wrists, and shoulders, and a positive Tinel's sign on the left.  (*Id.*)

A review of the ALJ decision reveals that he did consider Ms. Rauscher's November 2017 rheumatology visit, noting that she reported minimal morning stiffness and no medication side effects.  (Tr. 18 (citing Tr. 397).)  He also considered the June 2019 visit, noting findings of 11/18 positive tender points on examination.  (Tr. 18 (citing Tr. 1385).)  Ms. Rauscher is correct, however, that he did not explicitly acknowledge examination findings from the rheumatology visits in November 2017, June 2019, and October 2019 reflecting that her hands and wrists were "mildly tender to palpation" with a "positive Tinel's test L" and "diffuse[] tenderness of palpation" to the shoulders.  (Tr. 402, 1385, 2212.)  Conversely, it is noted that he also did not discuss examination findings that were within normal limits, including "no swelling, no warmth/erythema, full range of motion" in the hands, "fair range of motion" in the wrists, "full range of motion, no warmth/erythema" to the shoulders, and 5/5 strength.  (*Id.*)  It is also noted that the ALJ discussed a September 2018 rheumatology visit where Ms. Rauscher denied

36

symptoms of active SLE, reported no flares in a year, and demonstrated entirely normal physical examination findings.  (Tr. 18 (citing Tr. 697).)  In the context of Ms. Rauscher's limited rheumatology treatments, reports of limited to no symptoms or flares, and largely minor physical examination findings, the rheumatology records do not dictate a finding that the ALJ lacked substantial evidence to support the upper extremity limitations set forth in the RFC.

Ms. Rauscher also argues that her ongoing issues with trigger finger supported greater upper extremity limitations.  (ECF Doc. 12 p. 22.)  She acknowledges that the ALJ summarized her treatment for this condition, including surgery and injections, and that he explicitly found the RFC "provide[d] accommodations for the residual tension in the fingers as well as for residual symptoms of carpal tunnel syndrome."  (*Id.* (quoting Tr. 18).)  Nevertheless, she argues further limitations were justified in light of her testimony "that she experiences ongoing difficulties using her hands, including difficulty opening jars and using hand tools."  (*Id.*)  Given the ALJ's explicit recognition of treatment that was limited to bilateral cortisone injections in April 2018, right middle trigger finger release in August 2018, and a right middle finger cortisone injection in March 2019 (Tr. 18 (citing Tr. 667, 687, 728, 736)), and given the limited and conservative nature of Ms. Rauscher's treatment for this condition, the record does not support a finding that the ALJ lacked substantial evidence to support the upper extremity limitations in the RFC.

For the reasons set forth above, the undersigned finds Ms. Rauscher has not met her burden to demonstrate that the ALJ lacked substantial evidence to support his finding that she could perform work that required sedentary lifting and carrying and frequent handling, fingering, and feeling with both upper extremities.

### 3.      Whether Asthma Limitations Were Supported by Substantial Evidence

At Step Two, the ALJ found that the record in this case supported severe impairments

that were not identified in the prior ALJ decision in 2017, including asthma.  (Tr. 13-14.)  At

Step Three, he noted:

> The claimant treats for asthma with medications and nebulizer treatments. She went
> to the emergency room with an asthma exacerbation in 2017 (Exhibit C-10F/31).
> However, she responds well to treatment even while engaging in cigarette smoking.

(Tr. 14 (citing Tr. 781).)  At Step Four, the ALJ further observed:

> She went to the emergency room with asthma exacerbation in August 2018, and
> has chronic dyspnea from the asthma (Exhibits C-6F/6, C-10F/31). The residual
> functional capacity for sedentary exertion provides accommodations for residual
> symptoms despite good response to treatment, related to the claimant's heart
> condition, hypertension and breathing problems, especially since she reportedly
> quit smoking. All impairments combined, compounded by the effects of obesity,
> require she avoid all exposure to hazards in the workplace that may require she
> quickly move to avoid injury.

(Tr. 19 (citing Tr. 533 (10/4/18 pcp office visit), 781 (8/3/18 pcp office visit)).)

In her final argument, Ms. Rauscher contends that the ALJ "failed to consider significant

evidence of [her] asthma," and erred by adopting an RFC that "does not contain any limitations

concerning exposure to pulmonary irritants or temperature extremes" for her asthma.  (ECF Doc.

12 p. 22.)  In support, she points to some records cited by the ALJ, including an August 2018

primary care follow-up to an emergency room visit for an asthma exacerbation, where she was

discharged with prednisone and her symptoms were noted to be improved the next day (Tr. 781),

and an October 2018 primary care visit for dizziness where her provider noted she had "chronic

dyspnea due to asthma" but did not diagnose or prescribe treatment for asthma (Tr. 533-34).

Physical examinations at both visits showed her lungs were clear to auscultation with normal

breathing effort.  (Tr. 534, 782.)  Ms. Rauscher also points to treatment visits not discussed by

the ALJ, including her initial visit with Dr. Wasserbauer for asthma and breathing issues in May

2018, where she demonstrated an expiratory wheeze on examination and was prescribed albuterol with a nebulizer and prednisone (Tr. 556-58), an October 2018 cardiac office visit where Dr. Lyons indicated her reported dyspnea was likely related to sleep apnea and asthma, but noted clear lungs with no rales, rhonchi, or wheezing on examination, and observed that she reported smoking half a pack of cigarettes per day (Tr. 627-31), and a November 2018 pain management visit where she had a right lower expiratory wheeze on examination (Tr. 706).

A review of the ALJ decision reflects his acknowledgement that she received emergency room treatment on one occasion for an asthma exacerbation, treated her asthma with medication and nebulizer treatments, and responded well to treatment despite her continued smoking.  (Tr. 14, 19.)  These observations are consistent with what the medical records show.  (*See, e.g.,* Tr. 533-34, 551-53, 556-58, 627-31, 706, 781-82.)  Based on this analysis, the ALJ concluded that an RFC limitation to sedentary exertional work "provide[d] accommodations for residual symptoms despite good response to treatment[] related to the claimant's heart condition, hypertension and breathing problems, especially since she reportedly quit smoking."  (Tr. 19.)

While Ms. Rauscher contends that the limitation to sedentary work is inadequate to address the functional limitations caused by her asthma, she identifies no record evidence which specifically requires limitations in her exposure to pulmonary irritants or temperature extremes. Indeed, the ALJ specifically noted that she responded well to treatment for her asthma despite continued voluntary exposure to pulmonary irritants through her cigarette smoking.  (Tr. 14.) Ultimately, the RFC limitations applied by the ALJ were consistent with the evidence and adequately supported by the decision.  While Ms. Rauscher identifies evidence that could support environmental limitations, it is sufficient in this case that "substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For all of the reasons set forth above, the undersigned finds Ms. Rauscher has not met her burden to demonstrate that the ALJ lacked substantial evidence to support his RFC limitations relating to her mental impairments, upper extremity limitations, and asthma.  Accordingly, the undersigned recommends that the Court find Ms. Rauscher's sole assignment of error to be without merit and affirm the final decision of the Commissioner.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be AFFIRMED.


May 16, 2022

*/s/Amanda M. Knapp*
_____
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).